UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**RASSEKH SOBH,**

    **Plaintiff,**

v.                                          **Case No: 8:15-cv-716-T-30EAJ**

**HARTFORD LIFE & ACCIDENT**
**INSURANCE COMPANY,**

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Before the Court are Defendant Hartford Life and Accident Insurance Company's ("Defendant's") **Defendant's Dispositive Motion for Summary Judgment with Statement of Undisputed Material Facts and Memorandum of Law in Support Thereof** (Dkt. 13), Plaintiff Rassekh Sobh's ("Plaintiff's") **Plaintiff's Motion for Summary Judgment and Memorandum of Law** (Dkt. 14), **Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Memorandum of Law** (Dkt. 16), and **Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment** (Dkt. 17).[1]

This action is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001– 1461 ("ERISA"). Plaintiff challenges Defendant's decision to terminate Plaintiff's long-term disability benefits. For the reasons that follow, the Court recommends granting Defendant's motion for summary judgment (Dkt. 13) and denying Plaintiff's motion for summary judgment (Dkt. 14).

---

[1] This matter has been referred to the undersigned for consideration and issuance of a Report and Recommendation. See 28 U.S.C. § 636(b)(1)(B); Local Rules 6.01(b) and 6.01(c), M.D. Fla. (Dkt. 15)

I.     **Legal Standard**

Plaintiff bears the burden to prove entitlement to benefits under the plan. Oliver v. Aetna Life Ins. Co., 613 F. App'x 892, 899 (11th Cir. 2015) (per curiam) (unpublished).[2] Medical diagnoses and complaints of pain, alone, do not establish disability. Williams v. Hartford Life & Accident Insur. Co., 8:02-CV-85-T-17MAP, 2010 WL 557265, at *8 (M.D. Fla. Feb. 12, 2010). Instead, disability turns on Plaintiff's functional abilities. See, e.g., Crume v. Metropolitan Life Ins. Co., 417 F. Supp. 2d 1258, 1275 (M.D. Fla. 2006) "[I]rrespective of whether [the plaintiff] suffered from bipolar disorder or, instead, major depression, the record is replete with evidence suggesting [the plaintiff] retained sufficient functional ability to work in her occupation.").

In the Eleventh Circuit, a court reviewing an ERISA benefits decision is "limited to consideration of the material available to the administrator at the time it made its decision." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam). A six (6) step test is used to review a plan administrator's benefits decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is 'de novo wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is 'de novo wrong' and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious[3] standard).

---

[2] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

[3] "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." Blankenship, 644 F.3d at 1355 n.5.

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict,[4] then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355.

Even where a conflict of interest exists, the plaintiff continues to bear the burden to demonstrate that the decision was arbitrary. See Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008).

**II.    Relevant Factual Background**[5]

    A.    Overview

Plaintiff, a longtime employee of JPMorgan Chase Bank ("Chase"), had long-term disability coverage as a participant in an employee welfare benefit plan ("the plan") sponsored by Chase; the plan is funded by an insurance policy ("the policy") issued to Chase by Defendant. (Dkts. 2 at 2, 5 at 2-3, 7 Ex. 8 at 151-52) Defendant "ha[s] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Dkt. 7 Ex. 9 at 2)

The policy provides that long-term disability coverage is limited to active employees (Dkt. 7 Ex. 8 at 152) and will terminate on the date the employee ceases to be considered an active

---

[4] "A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." Blankenship, 644 F.3d at 1356.

[5] These facts are from the administrative record. (Dkt. 7)

employee. (Id. at 162)  According to the policy, long-term disability benefits become payable to the employee if the employee becomes disabled while covered by the policy and terminate at the occurrence of the first of several possible events, including the date the employee is no longer disabled or if the employee fails to supply requested proof of disability. (Id. at 156)  If the employee's employment terminates because the employee becomes disabled, the employee's coverage will continue "1. during the Elimination Period while [the employee] remain[s] Disabled by the same Disability; and 2. after the Elimination Period for as long as [the employee is] entitled to benefits under the Policy." (Id. at 162)

The policy defines disabled as whether, for the first twenty-four (24) months following the Elimination Period, the employee is unable to perform one or more of the essential duties of his own occupation; after the first twenty-four (24) months, in order for the employee's eligibility for benefits to continue, the employee must be unable to perform the essential duties of any occupation. (Dkt. 7 Ex. 1 at 149)

    B.    Chronology of Events

In summary, Plaintiff was found disabled under the policy effective February 3, 2010. Although Defendant terminated Plaintiff's benefits as of January 1, 2013, due to lack of proof of a continuing disability, Defendant reinstated Plaintiff's benefits later that month after receiving the requested records.  On June 17, 2014, Defendant terminated Plaintiff's benefits, finding that Plaintiff was not prevented from performing the essential duties of "any occupation" and did not satisfy the policy's disability definition as of June 17, 2014, and reaffirmed that finding on appeal. (Dkt. 7 Ex. 1 at 133, 138, 154)

Plaintiff worked for JPMorgan Chase Bank as a Technical Operations Lead, a position that

4

appears to involve sitting for much of the day. (Dkt. 7 Ex. 1 at 128, 151, Ex. 6 at 3)  In 2007, Plaintiff underwent a diskectomy, which had to be performed a second time nine (9) days later because his disc herniated again. (Dkt. 7 Ex. 5 at 2)  Plaintiff ceased work as of August 5, 2009. (Dkt. 7 Ex. 1 at 89, 129)  In November 2009, Plaintiff underwent a Lumbar Fusion at the L5/S1 level, performed by Joseph W. Dryer, M.D. ("Dr. Dryer"). (Dkt. 7 Ex. 4 at 47, 49-50, Ex. 5 at 2)

Plaintiff applied for long-term disability benefits under the policy on January 14, 2010, and his claim was approved, with benefits effective February 3, 2010. (Dkt. 7 Ex. 8 at 47-52)

Plaintiff underwent another surgery, which included a transforaminal interbody fusion at L4/5 and segmental hardware removal at L5-S1, in July 2011. (Dkt. 7 Ex. 1 at 106, Ex. 7 at 55-59) In November 2011, Defendant determined Plaintiff would remain disabled under the "any occupation" standard and continued Plaintiff's benefits. (Dkt. 7 Ex. 1 at 104-106, Ex. 2 at 27) Defendant made this determination in light of the July 2011 surgery, Plaintiff's history of surgeries, and Dr. Dryer's opinion that Plaintiff was incapable of full-time sedentary work involving frequent sitting and reaching at desk or waist level. (Dkt. 7 Ex. 1 at 104-106)  Under the plan, in order to continue receiving long-term disability benefits Plaintiff was required to prove, as of February 3, 2012, that he was unable to perform the essential duties of any occupation. (Dkt. 7 Ex. 1 at 151)

Utilizing a representative ("Allsup") retained by Defendant, Plaintiff applied for Social Security benefits; in January 2012, the Social Security Administration determined Plaintiff was disabled, within the meaning of the Social Security Act, and allowed his claim for Social Security Disability Insurance. (Dkt. 7 Ex. 7 at 22-26)[6] Defendant recovered $63,061.27 in overpayment from

---

[6] The administrative record does not contain the opinion of the Administrative Law Judge ("ALJ") for the Social Security Administration. (Dkt. 7 Ex. 1 at 6)

Plaintiff as a result of Plaintiff's successful Social Security application. (Dkt. 7 Ex. 7 at 5)

On November 21, 2012, Dr. Dryer opined that Plaintiff was unable to work any job and was permanently disabled. (Dkt. 7 Ex. 5 at 46) However, Dr. Dryer failed to provide updated treatment records, despite several requests; on this basis, Defendant terminated Plaintiff's benefits as of January 1, 2013, for failing to provide the requested proof of continuing disability. (Dkt. 7 Ex. 1 at 90, Ex. 2 at 8-12, Ex. 5 at 47)  Defendant reinstated Plaintiff's benefits at the end of January 2013 after receiving updated treatment records from Dr. Dryer. (Dkt. 7 Ex. 1 at 85-86)

In an Attending Physician's Statement of Functionality, dated November 22, 2013, Dr. Dryer marked "never" with regard to Plaintiff's ability to lift or carry any amount of weight between one (1) and one hundred (100) pounds, reach at any level (below desk or waist level, at desk or waist level, or above the shoulder), and perform fingering or handling. (Dkt. 7 Ex. 4 at 26) Dr. Dryer also opined that Plaintiff could sit, stand, and walk no longer than half an hour at a time for each activity, and no longer than a total of two (2) to three (3) hours for each activity throughout the workday. (Id.)

In January 2014, an investigative firm hired by Defendant conducted video surveillance of Plaintiff for two days. (Dkt. 7 Ex. 6 at 35-37).  On January 6, 2014, Plaintiff was observed entering the community clubhouse in his complex, wearing workout clothes, and carrying a water bottle; he spent forty-five (45) minutes inside and then drove to a dental office. (Id. at 36) On January 7, 2014, Plaintiff was again observed entering the community clubhouse, wearing workout clothing, and carrying a water bottle; he spent about fifty-five (55) minutes inside and also visited a doctor's office that day. (Id.)[7] Plaintiff displayed no visible impairment and was not seen using an assistive device.

---

[7] Plaintiff was not filmed inside the clubhouse. (Dkt. 7 Ex. 6 at 36)

(Id.)  In February 2014, Defendant forwarded the surveillance evidence to Dr. Dryer and requested an assessment of Plaintiff's functional ability in light of the evidence, but Defendant did not receive a response. (Dkt. 7 Ex. 1 at 153, 159-61)

In April 2014, William Dinenberg, M.D., ("Dr. Dinenberg") conducted an independent medical examination of Plaintiff at Defendant's request. (Dkt. 7 Ex. 6 at 10-14)  At the examination, Plaintiff reported, among other things, that he could not lift more than ten (10) pounds, could not walk greater than fifteen (15) to twenty (20) minutes due to back pain, could not stand for longer than ten (10) to fifteen (15) minutes, and could not sit for more then fifteen (15) to twenty (20) minutes without worsening back pain. (Id. at 11)  Plaintiff also stated that he was unable to get comfortable in any one position and suffered from side effects caused by his medication, such as difficulty with concentration and memory. (Id.)  Plaintiff reported performing abdominal exercises and intermittently walking or using an elliptical machine. (Id.)  Plaintiff could drive, dress himself, and perform activities of daily living, except that he had difficulty putting on socks. (Id.)  Plaintiff did not perform yard work, cooking, or cleaning. (Id.)

On examination, Dr. Dinenberg observed that Plaintiff walked with a slow, non-antalgic gait, did not use an assistive device, and was able to climb onto the examination table on his own. (Id. at 13)  Plaintiff had full (five out of five) strength in his quadriceps, hamstring, gastrocsoleus, tibialis anterior, and extensor longus bilaterally, and his surgical scars were without erythema or echymosis and were non-tender to palpation. (Id.)  Plaintiff had minimal tenderness in the paraspinous region but an attempted straight leg raise in a seated position caused low back pain bilaterally. (Id.)  Plaintiff's lumbar flexion was noted to forty (40) degrees and extension to five (5) degrees. (Id.)

Dr. Dinenberg opined that Plaintiff was capable of employment at a forty (40) hour per

7

workweek level with the following restrictions: walking no more than twenty (20) minutes per hour and no more than one (1) hour in an eight (8) hour workday, standing for no more than fifteen (15) minutes at a time and no more than one (1) hour in an eight (8) hour workday, sitting for no more than twenty (20) minutes at a time and no more than six (6) hours in an eight (8) hour workday, lifting or carrying no more than ten (10) pounds, and pushing or pulling no more than twenty (20) pounds. (Id. at 13-14)  Plaintiff should not push, pull, or carry for more than two (2) hours in an eight (8) hour workday and should not bend, kneel, climb, crawl, or stoop more than one hour in an eight (8) hour workday. (Id. at 14)  Dr. Dinenberg noted that Plaintiff reported significant difficulty with concentration and memory caused by his medications, but declined to place restrictions based on those medications, as such restrictions were outside his field of specialty. (Id.)

Defendant forwarded Dr. Dinenberg's report to Dr. Dryer with a request for comments, but received no response. (Dkt. 7 Ex. 1 at 153, 156)

In June 2014, Defendant used an Occupational Access System[8] to conduct an Employability Analysis for Plaintiff. (Dkt. 7 Ex. 5 at 105-150)  The system found five (5) sedentary, managerial occupations consistent with Dr. Dinenberg's opinion that were suitable for Plaintiff and that met or exceeded the required earnings potential: Manager, Benefits; Manager, Credit and Collections; Manager, Office; Manager, Title Search; and Manager, Computer Operations. (Id. at 107)  These occupations required "mostly seated work and would allow [Plaintiff] the ability to self-regulate positional changes between sitting, standing, and walking as needed." (Id.)  The Employability Analysis incorrectly and repeatedly identified Plaintiff as female. (Id. at 105-07)

---

[8] Defendant describes this system as "a computerized job-matching program that cross-references an individual's capabilities and qualifications with 12,791 occupations as classified by the U.S. Department of Labor's Dictionary of Occupational Titles ('DOT')." (Dkt. 13 at 7).

8

In June 2014, Defendant notified Plaintiff in a seven-page letter of its decision to terminate benefits, effective June 17, 2014, based on surveillance, Dr. Dinenberg's examination, and the Employability Analysis. (Dkt. 7 Ex. 1 at 149-55) The letter also noted the efforts taken by Defendant to obtain a response from Dr. Dryer regarding the video surveillance and independent examination performed by Dr. Dinenberg and Dr. Dryer's failure to respond. (Dkt. 7 Ex. 1 at 153)

Through counsel, Plaintiff timely appealed in August 2014. (Dkt. 7 Ex. 5 at 2-4) James Boscardin, M.D., ("Dr. Boscardin") reviewed Plaintiff's medical file at Defendant's request. (Dkt. 7 Ex. 4 at 9-15) In his Medical Record Review, dated November 17, 2014, Dr. Boscardin opined that, after reviewing the medical record, the report of Dr. Dinenberg's examination, and the surveillance tape, and after speaking with Dr. Dryer, Plaintiff was capable of ambulating and functioning at a greater level than claimed. (Id. at 14) Dr. Boscardin stated that Plaintiff was capable of sedentary activity on a full-time basis; he could lift no more than ten (10) pounds, could walk or stand for no more than fifteen (15) minutes each (and no more than three (3) sessions of fifteen (15) minutes each in an eight (8) hour period), and could sit for no more than one (1) hour at a time with interruptions for nature breaks and position changes. (Id. at 14-15) Additionally, Dr. Boscardin found no evidence that Plaintiff required use of a walker. (Id. at 15) Dr. Boscardin also noted that he teleconferenced with Dr. Dryer and that Dr. Dryer agreed that Plaintiff was capable of working "eight hours per day, 40 hours per week with appropriate restrictions." (Id. at 14). A later opinion from Dr. Dryer confirmed that Dr. Dryer spoke with Dr. Boscardin on October 27, 2014, and that "at that time, [Dr. Dryer] expressed the opinion that [Plaintiff] was capable of a full[-]time sedentary position with sitting restricted to one hour at a time." (Dkt. 7 Ex. 3 at 11)

An additional Employability Analysis was performed on November 23, 2014, based on the

restrictions and limitations identified by Dr. Boscardin. (Dkt. 7 Ex. 3 at 15-51, Ex. 4 at 1-8) The analysis identified the same five occupations that were previously identified as suitable occupations for Plaintiff. (Dkt. 7 Ex. 3 at 15) This Employability Analysis also identified Plaintiff as female in several sentences, though it correctly identified Plaintiff as male in others. (Id. at 15-16) Defendant notified Plaintiff by letter on November 25, 2014, of its decision to uphold the termination of benefits on appeal. (Dkt. 7 Ex. 1 at 136-139)

In January 2015, Plaintiff submitted a report, dated January 9, 2015, from Dr. Dryer (Dkt. 7 Ex. 3 at 9-13), along with additional medical records (Dkt. 7 Ex. 1 at 8). In submitting Dr. Dryer's January 2015 report to Defendant, Plaintiff requested that Defendant withdraw its denial of benefits and resume payment of Plaintiff's long-term disability benefits immediately. (Id. at 9)

Dr. Dryer reported that when he saw Plaintiff for follow-up on January 9, 2015, Plaintiff's neurologic examination was normal. (Id. at 10) But, Dr. Dryer stated that his opinion (that Plaintiff was capable of a full-time sedentary position with sitting restricted to one (1) hour at a time) had changed and opined that, "[a]fter today's physical examination and reviewing new radiologic studies,[9] it is now my opinion that [Plaintiff] is disabled from any type of employment." (Id.)

After conferring with Dr. Dryer's nurse, Dr. Boscardin authored an Addendum Medical Record Review. (Id. at 6-8) Dr. Boscardin opined that Plaintiff was capable of full-time sedentary

---

[9] Dr. Dryer stated that the x-rays taken on January 9, 2015, showed Plaintiff's fusion continued to progress at L4-L5, but that the entire disc space had not yet ossified. (Dkt. 7 Ex. 3 at 10) Although Plaintiff was experiencing local hardware irritation at L4-L5, Dr. Dryer opined that more complete ossification of the L4-L5 disc space was required before the hardware could be removed and that such removal would need to be delayed for at least one (1) year. (Id. at 10-11) He also stated that a lumber MRI taken in November 2014 showed Plaintiff was developing spinal stenosis at L3-L4 above his fusions. (Id. at 10-11) However, Dr. Dryer's January 9, 2015 report stated that surgery was not warranted or recommended for Plaintiff's compression at that time. (Id. at 10-11)

10

activity through January 9, 2015, but that after January 9, 2015, the date of Dr. Dryer's latest report, Plaintiff was precluded from sedentary functions. (Id. at 8)  Subsequently, Defendant advised Plaintiff by letter, dated February 16, 2015, that its decision to terminate benefits remained unchanged. (Dkt. 7 Ex. 1 at 132-33)  Defendant acknowledged that both Dr. Dryer and Dr. Boscardin found Plaintiff was precluded from sedentary work after January 9, 2015, but explained that Plaintiff was no longer covered by the policy at that time as Plaintiff did not meet the definition of disability applicable to his claim between June 17, 2014, and January 9, 2015. (Id. at 133)

**III.**     **Discussion**

        A.       Whether Defendant's Decision is De Novo "Wrong"

The first step in reviewing an ERISA plan administrator's benefits decision requires the Court to "[a]pply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision)." Blankenship, 644 F.3d at 1355.

For the following reasons, considering the material available to Defendant when it made its termination decision in June 2014, its decision on appeal in November 2014, and its decision to uphold the appeal in February 2015, Defendant's termination decision was not de novo wrong. Blankenship, 644 F.3d at 1354.

In addressing Plaintiff's disability claim, Defendant obtained and relied upon medical records and opinions from Dr. Dryer, Plaintiff's treating physician.  After determining Plaintiff was disabled, based on multiple back surgeries and the medical records and opinions provided by Dr. Dryer,  Defendant paid Plaintiff's long-term disability benefits between February 2010 and June 2014.

Although Plaintiff contends that Defendant's decision to ignore Dr. Dryer's previous opinions and restrictions was wrong, the most recent statement from Dr. Dryer before Defendant's termination decision was from November 2013. Dr. Dryer stated Plaintiff could not lift any amount of weight or reach at any level and was significantly limited with regard to sitting, standing, and walking. But, by June 17, 2014, Defendant had additional evidence: the January 2014 video surveillance, the results of Dr. Dinenberg's April 2014 independent examination, and the June 2014 Employability Analysis. Dr. Dryer failed to submit updated findings or an updated opinion upon request following Defendant's receipt of the video surveillance and Dr. Dinenberg's report.

Plaintiff asserts that Defendant's reliance on Dr. Dinenberg's opinion was wrong because Plaintiff takes narcotic medication for severe pain which causes impaired memory and concentration and Dr. Dinenberg refrained from opining on the side effects of those medications. However, Dr. Dinenberg's report states that Dr. Dryer, Plaintiff's treating physician, found "no issues with [Plaintiff's] long-standing use of the medications." (Dkt. 7 Ex. 4 at 12) Further, although Dr. Dinenberg's report described Plaintiff's complaints of concentration and memory deficits, Plaintiff does not point to any opinion from Dr. Dryer demonstrating that medication side effects caused Plaintiff to experience disabling impairment.

Any inadvertent references to Plaintiff as female in the June 2014 and November 2014 Employability Analyses do not render that evidence unreliable. The references to Plaintiff as female are not material, as the analyses also refer to Plaintiff as male in some instances. (Dkt. 7 Ex. 3 at 15, Ex. 5 at 105)

Nor were Defendant's decisions on and after the administrative appeal wrong. On administrative appeal, Defendant considered additional evidence submitted by Plaintiff. Dr. Dryer

12

expressed, during an October 27, 2014 telephone call with Dr. Boscardin, that he believed Plaintiff was capable of performing full-time sedentary work with sitting limited to one hour at a time. (Dkt. 7 Ex. 4 at 12) On November 17, 2014, Dr. Boscardin opined in his Medical Record Review that Plaintiff was capable of sedentary work with identified limitations. (Dkt. 7 Ex. 4 at 14-15) Post-appeal, in a January 9, 2015 report, Dr. Dryer confirmed that he opined during the October 27, 2014 teleconference with Dr. Boscardin that Plaintiff was capable of full-time sedentary work with sitting restricted to one (1) hour at a time, but stated that "[a]fter today's physical examination and reviewing new radiologic studies, it is now my opinion that [Plaintiff] is disabled from any type of employment." (Dkt. 7 Ex. 3 at 11) Subsequently, Dr. Boscardin performed an additional review and opined that, while Plaintiff was disabled after January 9, 2015, he was not disabled as of June 17, 2014. (Dkt. 7 Ex. 3 at 8) These records support Defendant's decision to terminate Plaintiff's benefits as of June 17, 2014, as they demonstrate that Plaintiff was no longer disabled under the policy at that time.

Although Plaintiff contends that Dr. Dryer's January 9, 2015 opinion changed his prior opinion that Plaintiff was capable of full-time sedentary work, the record demonstrates that Dr. Dryer's opinion that Plaintiff was completely disabled was made as of January 9, 2015, not November 4, 2014; a plain reading of Dr. Dryer's report demonstrates that his January 9, 2015 opinion was based not only on the November 4, 2014 MRI, but also on the examination of Plaintiff that Dr. Dryer performed on January 9, 2015. (Id. at 11)[10] Moreover, the radiologic studies reviewed

---

[10] For the same reason, Plaintiff's argument that the November 4, 2014 MRI repudiates Dr. Boscardin's evaluation of Dr. Dryer's November 17, 2014 opinion, is not persuasive. Dr. Dryer confirmed his opinion was the same as that recounted by Dr. Boscardin, and therefore Dr. Boscardin's November 17, 2014 Medical Record Review did not misconstrue Dr. Dryer's October 27, 2014 opinion.

by Dr. Dryer in forming his January 9, 2015 opinion included x-rays taken that day.[11] (Id. at 10) Viewing Dr. Dryer's January 9, 2015 opinion as a whole, that Dr. Dryer stated later in his opinion that it "remains" his opinion that Plaintiff is completely disabled does not alter the conclusion that Dr. Dryer's opinion that Plaintiff was completely disabled was made as of January 9, 2015. (Id. at 11)

Although Plaintiff asserts that Defendant improperly credited the November 17, 2014 opinion of Dr. Boscardin over the opinion of Dr. Dryer, Plaintiff's treating physician, this argument is without merit. While plan administrators may not arbitrarily refuse to credit reliable evidence provided by a claimant, plan administrators are not required to automatically accord the opinions of a claimant's treating physicians special weight. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Plan administrators may instead credit reliable evidence that conflicts with a treating physician's evaluation, such as the opinions of examining and reviewing physicians. See, e.g., Howard v. Hartford Life & Accident Ins. Co., 563 F. App'x 658, 663-64 (11th Cir. 2014) (per curiam) (unpublished); Bloom v. Hartford Life & Accident Ins. Co., 558 F. App's 854, 856 (11th Cir. 2014) (per curiam) (unpublished).

Plaintiff's argument that Dr. Boscardin completely disregarded Dr. Dryer's November 2013 opinion regarding Plaintiff's functional capabilities is refuted by Dr. Boscardin's November 17, 2014 report, which specifically identified Dr. Dryer's prior Attending Physician Statements and letters regarding Plaintiff's functionality as part of the material Dr. Boscardin reviewed. (Dkt. 7 Ex. 4 at 10) That Dr. Boscardin did not specifically discuss those limitations does not undermine his

---

[11] Even if Dr. Dryer's January 9, 2015 opinion related back to November 4, 2014 (the date of the MRI), this evidence post-dated Defendant's determination that Plaintiff was no longer disabled as of June 17, 2014.

opnion; Dr. Boscardin relayed the substance of his October 27, 2014 conversation with Dr. Dryer and adopted the restrictions opined by Dr. Dryer during that telephone call.

Nor does Dr. Boscardin's reliance on a conversation with Dr. Dryer's nurse in January 2015 render Defendant's decision wrong.[12] Dr. Dryer's January 9, 2015 opinion, as written, is consistent with his opinion, as stated by his nurse, that Plaintiff was precluded from a sedentary level of function as of January 9, 2015.

Plaintiff also challenges Defendant's conclusion that Plaintiff could perform sedentary work while being limited to sitting for one hour at a time. Although Plaintiff attempts to distinguish the cases cited by Defendant, Plaintiff does not challenge the results of the employability analyses (other than asserting that the Employability Analyses incorrectly refer to Plaintiff as female), or argue that the occupations identified by the Employability Analyses would not allow for a break from sitting each hour.

Plaintiff's assertion that Defendant improperly disregarded the Social Security Administration's January 2012 determination that Plaintiff was disabled is also without merit. "[T]he approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (per curiam).

---

[12] Defendant forwarded Dr. Dryer's January 9, 2015 report to Dr. Boscardin for review and requested that Dr. Boscardin confer with Dr. Dryer regarding the reason for his change of opinion. (Dkt. 7 Ex. 3 at 7) Dr. Boscardin was instructed that "[i]f Dr. Dryer cannot be reached after three attempts, please have [Dr. Boscardin] fax [Dr. Dryer] the questions and allow another three (3) business days for a response. If no response has been received at that time, please proceed with the review without physician contact." (Id.)

15

In this case, the relevance of the Social Security Administration's disability determination is, at most, limited. The Social Security Administration determined Plaintiff was disabled in January 2012, a time during which Defendant agreed Plaintiff was disabled under the terms of the policy. Defendant made its termination decision over two (2) years later, on re-evaluation after acquiring new evidence that did not exist at the time of the Social Security Administration's decision. Further, Defendant's June 17, 2014 and November 25, 2014 decision letters acknowledged that its decision was contrary to that found by the Social Security Administration, but explained that the definition of disability for purposes of the policy was different than the Social Security Administration's definition of disability and noted the evidence Defendant considered in reaching its decision. Thus, Defendant's failure to include a copy of the Social Security Administration ALJ's opinion in the administrative record and failure to give significant weight to the decision of the Social Security Administration at the time Defendant terminated Plaintiff's benefits was not error.

Also without merit is Plaintiff's argument that Defendant's February 16, 2015 finding that Plaintiff was no longer eligible for disability benefits is inconsistent with the doctrine of contra proferentem,[13] However, Plaintiff does not identify any ambiguous policy language. Instead, Plaintiff argues that Defendant's interpretation of the evidence, finding Plaintiff not disabled as of June 17, 2014, but disabled again as of January 9, 2015, is unreasonable. In doing so, Plaintiff appears to conflate the issue of ambiguous policy language with the issue of conflicting medical evidence. But, as previously discussed, Defendant was entitled to consider reliable evidence contradicting the opinions of Plaintiff's treating physician in re-evaluating Plaintiff's claim for

---

[13] Contra proferentem is "[t]he doctrine that, in the interpretation of documents, ambiguities are to be construed unfavorably to the drafter." *Contra Proferentem*, Black's Law Dictionary (10th ed. 2014).

16

disability benefits.

Where clear and unambiguous, the terms of an ERISA plan must be enforced as written. Johnson Controls, Inc. v. Flaherty, 408 F. App'x 312, 313 (11th Cir. 2011) (per curiam) (unpublished). The policy specifically provided that Plaintiff's benefits would continue only while Plaintiff remained disabled and eligible for benefits pursuant to the policy. (Dkt. 7 Ex. 8 at 162) While Defendant agreed that Plaintiff became disabled again as of January 9, 2015, that determination did not alter the well-supported conclusion that Plaintiff's disability coverage ceased as of June 17, 2014. Accordingly, Defendant's termination decision is not de novo wrong.

B.    Whether Reasonable Grounds Supported Defendant's Decision

Even if Defendant's discretionary decision were de novo wrong, Defendant's decision to terminate Plaintiff's long-term disability benefits was reasonable. See Blankenship, 644 F.3d at 1354 (if the administrator's decision is de novo wrong, and the administrator was vested with discretion in reviewing claims, step three (3) requires the Court to determine whether reasonable grounds supported the decision). Reasonableness is determined based on the facts known to the administrator at the time the decision was made. Thomas v. Hartford Fire Ins. Co., No. 6:-7-cv-1983-Orl-28GJK, 2009 WL 3200954, at *7 (M.D. Fla. Sept. 30, 2009). "As long as a reasonable basis appears for [the] decision [of the Committee], it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." White v. Coca-Cola Co., 542 F.3d 848 (11th Cir. 2008) (citation and internal quotation marks omitted).

If reasonable grounds exist, the final steps in the review process require the Court to determine whether a conflict of interest exists, and, if so, the Court then considers the conflict of interest as a factor in determining the reasonableness of Defendant's termination decision. See

Blankenship, 644 F.3d at 1354.

As described above, Defendant's decision was based on reliable evidence in the record. As for Defendant's conceded structural conflict of interest (Dkt. 13 at 12), Plaintiff asserts Defendant's decision was unreasonable due to Defendant's failure to include in the administrative record a copy of the Social Security Administration ALJ's opinion, Defendant's failure to consider the ALJ's opinion in light of Defendant's pecuniary benefit from Plaintiff's award of Social Security benefits, Dr. Boscardin's reliance on a conversation with Dr. Dryer's nurse, and Defendant's alleged selective and self-serving consideration and interpretation of the evidence. However, as addressed above, Plaintiff's arguments on these issues are not persuasive. Therefore, even in light of Defendant's conflict of interest, Defendant's decision was reasonable and not arbitrary and capricious.

    C.    <u>Whether Remand is Required</u>

Plaintiff alternatively submits that remand is required due to Defendant's mischaracterization of the medical evidence and failure to include the Social Security Administration ALJ's opinion in the record.

Plaintiff's argument that the case involves the kind of procedural irregularities present in <u>Melech v. Life Ins. Co. of N. Am.</u>, 739 F.3d 663 (11th Cir. 2014), is unpersuasive. In <u>Melech</u>, the plan administrator required the claimant to apply for Social Security benefits but denied the claimant's long-term disability claim while the claimant's Social Security claim was still pending. <u>Id.</u> at 665. The claimant appealed, and, during the pendency of the appeal, the Social Security Administration asked the claimant to visit two new physicians for independent assessment. <u>Id.</u> The Social Security Administration granted the claimant's application for disability benefits, but the plan administrator denied the claimant's two consecutive appeals without asking for the Social Security

18

Administration's decision or records. Id.  The court concluded that the plan administrator's treatment of the claimant's Social Security application was "inconsistent with the fundamental requirement that an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process," id. at 676, and explained that the proper course of action was to remand the claim to the plan administrator. Id.

The facts in the instant case are distinguishable from those in Melech.  As both the Social Security Administration and Defendant considered Plaintiff disabled in 2012, there was no inconsistency between the decisions of the Social Security Administration and Defendant at the time the Social Security Administration rendered its decision.  Defendant continued to pay benefits to Plaintiff for more than two years following the Social Security Administration decision.  It was only after new evidence became available to Defendant, in the form of video surveillance, a report from independent examiner Dr. Dinenberg, and an Employability Analysis, that Defendant found Plaintiff no longer disabled on re-evaluation.

Plaintiff has noted other procedural irregularities, including references to Plaintiff as female in the Employability Analyses and Dr. Boscardin's conference with Dr. Dryer's nurse, rather than Dr. Dryer himself, concerning Dr. Dryer's January 9, 2015 opinion.  These alleged defects do not invalidate Defendant's denial of benefits, and they do not warrant remand.

**IV.   Conclusion**

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1) Defendant's Dispositive Motion for Summary Judgment with Statement of Undisputed Material Facts and Memorandum of Law in Support Thereof (Dkt. 13) be **GRANTED**, and

19

(2) Plaintiff's Motion for Summary Judgment and Memorandum of Law (Dkt. 14) be **DENIED**.

**DATE:** November 5, 2015

ELIZABETH A JENKINS
United States Magistrate Judge

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

Copies to:
Counsel of Record
District Judge